OPINION
Tracey Renee Martin was charged by indictment with possession of cocaine that is not crack cocaine in an amount less than 5 grams. Martin moved to suppress certain statements she made to a police officer after having been stopped for jaywalking. Those statements led to her arrest for the cocaine violation. The trial court granted her suppression motion and the State appealed pursuant to R.C. 2945.67(A) and Crim.R. 12(K).
The facts surrounding this appeal are not essentially in dispute and are set out in Martin's brief. They are as follows.
At approximately 6:40 a.m. on August 5, 2001, while on routine patrol in the area of Williams Street and Riverview Avenue, Officer Shawn Emerson of the Dayton Police Department observed a woman, later identified as Martin, walking in the middle of North Williams Street. Believing that Martin was jaywalking, Officer Emerson circled around and pulled his cruiser to the curb next to her. When Martin saw Officer Emerson, she hopped up onto the sidewalk and continued to walk north on Williams Street. Officer Emerson asked Martin to stop, asked for her name, and then advised her that he had observed her jaywalking and that he was going to issue her a citation for that offense.
The area of the stop was a "very high-drug area," and Officer Emerson knew from experience that there were always people walking around that area or loitering, many of whom carried weapons of some sort. Officer Emerson was concerned that, if he wrote the citation outside his cruiser, it would be difficult to keep his eye on Martin and also on other people in the area. Id. For safety reasons, therefore, Officer Emerson told Martin that he was going to have her sit in his cruiser while he wrote out the citation.
Before doing so, however, Officer Emerson asked Martin if there was "anything on [her] that [he] need[ed] to be concerned about," such as "weapons, crack pipes, needles, drugs." Martin immediately broke eye contact with Emerson, looked to the ground, and said "well, yeah." Martin told Officer Emerson that she had a "stem," which Emerson understood to be a crack pipe. Id. Officer Emerson asked Martin where it was, and she held up a cigarette pack and stated, "in here." Id. Emerson took the cigarette pack from Martin, walked her to his cruiser, patted her down, and placed her in the back seat of the cruiser. Id.
When Officer Emerson looked inside the cigarette pack, he saw a three-inch metal crack pipe and a three-inch glass crack pipe with a rubber insulator. Id. Upon pulling the glass crack pipe out of the cigarette pack, Officer Emerson observed "a substantial amount of [crack cocaine] residue on the inside, coating the inside walls of that crack pipe."
At that time, Officer Emerson advised Martin that she was under arrest, placed her in handcuffs, and informed her of her Miranda rights. After Martin indicated that she was willing to speak to him, Emerson asked her a series of questions. The defendant's responses to those questions revealed that she had been smoking crack since she was nineteen years old, she had smoked crack from the glass crack pipe the previous night, she was aware of the presence of residue inside the pipe, she had never scraped out the pipe and smoked the residue but had heard that other people did, and she understood that the residue inside her pipe was from the crack she smoked the night before. Defendant did not request an attorney and did not ask to terminate the interview. Officer Emerson ultimately cited Martin for jaywalking and transported her to the Montgomery County Jail. Id.
In granting Martin's suppression motion, the trial court stated:
 Defendant seeks to suppress the crack pipe/residue and statements arguing that the evidence was discovered in contravention of Defendant's Fifth Amendment rights as enunciated in Miranda v. Arizona (1966), 384 U.S. 546., Defendant's position is the defendant was in custody and interrogated, thus the crack pipe/residue should be excluded along with any statements made as a result of the initial unlawful inquiry/interrogation.
 The State of Ohio's position is the Defendant was merely the subject of an investigatory stop and her Fifth Amendment rights were not implicated. The State of Ohio correctly argues that "police officers may conduct reasonable searches of individuals who are not in custody to ensure they are not armed prior to conducting any investigatory questioning." Id. citing Terry v. Ohio (1968), 392 U.S. 1, 23 because "Fourth Amendment intrusion concerns do not force a `police officer to forsake reasonable precautionary measures, during the performance of his duties'." Id, quoting State v. Evans (1983), 57 Ohio St.3d 405, 410.
 However, the issue before this Court involves questioning/interrogation that exceeded Officer Emerson's legitimate safety concerns. This Court believes wholeheartedly in procedures which help ensure the safety of officers. This Court also recognizes the serious threat too often posed officers in "high crime areas." Thus, in certain circumstances, reasonable precautionary measures may include placing a defendant in a cruiser and subjecting him/her to a pat-down for weapons.
 However, procedures, questions, and yes, "interrogation" cannot be utilized unnecessarily to flout basic fundamental rights of citizens.
 This Court shall not sanction the type of questioning used by Officer Emerson regarding whether the defendant had drugs. More specifically, on cross-examination, the officer ultimately corrected his earlier testimony by admitting his question to defendant encompassed more than weapons. In fact, his report reflects he asked about "weapons, crack pipes, needles, drugs" Tr. pg. 19 line 4.
 How does the presence of "drugs" pose a threat of harm to the officer? It is clearly a question that begs for an incriminating response, a question not necessary or associated with "reasonable safety measures," a question totally without nexus to a jaywalking citation on an early summer morning!
In fact, Officer Emerson stated the following:
[Q] Are you in fear of your safety by drugs?
[A] No (Tr. Pg. 18 line 7-8)
 The reasonable alternative and legitimate course would be a Terry pat-down during a minor misdemeanor encounter, by verbally exceeding Terry's limited scope. In doing so, this otherwise "on scene investigative questioning", becomes a "fishing expedition." It becomes a rouse for "interrogation" of other crimes wholly unrelated to jaywalking.
 Indeed, police officers face great danger in today's society. However, the Court must be vigilant and careful to protect the rights of all citizens. The average citizen does not expect to become subject to questioning regarding "crack pipes and drugs" when he has merely "jaywalked," nothing more, nor should he be! The uneducated and vulnerable citizen living in a high crime area should be afforded the same constitutional protection.
 Ms. Martin was not under suspicion for a crime of violence or any crime for that matter. If the officer can ask about drugs, how about stolen credit cards, forged documents! The list is endless . . . all without basis.
 Given the circumstances and scope of the question, this Court concludes Defendant's freedom of movement was restrained to a substantial degree associated with a formal arrest designed to ask an impermissible question, designed to elicit an incriminating response.
 Miranda warning should have been given when the officer "interrogated" defendant beyond safety concerns. Given the totality of circumstances, a reasonable person in Ms. Martin's circumstances would have been understood her situation to be not
one of "routine questioning" for a jaywalking ticket, but one of deprivation of her freedom of action in a significant way.
 Ms. Martin's due process rights were clearly violated. Accordingly, Defendant's Motion to Suppress is granted in its entirety. Clearly her later statements were fruit of the initial illegal taint.
Motion Granted.
In a single assignment of error, the State contends that the trial court erred in granting Martin's suppression motion because she was in custody at the time she made the statements to the police officer. For the reasons that follow we agree with the State's argument.
An appellate court conducts a "de novo" review of whether the facts meet the appropriate legal standard. Ornelas v. United States (1991),517 U.S. 690. The warnings set forth in Miranda v. Arizona (1966),384 U.S. 436, are required only when a suspect is subjected to custodial interrogation. The United States Supreme Court defines custodial interrogation as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." Id. at 444. Accordingly, police are not required to administer Miranda warnings to every individual they question. Oregon v. Mathiason (1977), 429 U.S. 492, State v. Biros
(1997), 78 Ohio St.3d 426, 440. Rather, the Supreme Court of Ohio has explained:
 The determination whether a custodial interrogation has occurred requires an inquiry into how a reasonable man in the suspect's position would have understood his situation. * * * The ultimate inquiry is simply whether there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest. (Emphasis ours).
Biros, supra. See, also, California v. Beheler (1983), 463 U.S. 1121,1125.
In this case, Officer Emerson stopped Martin on a public sidewalk after observing her jaywalking, a minor misdemeanor offense. Emerson informed Martin why he stopped her and told her that he was going to issue her a citation.
The nature of the interaction between Martin and Officer Emerson in this case is akin to a traffic stop, where an officer observes a traffic violation and pulls the vehicle over to issue the driver a citation.Berkemer v. McCarty (1984), 468 U.S. 420, 440. The Supreme Court explained:
 Two features of an ordinary traffic stop mitigate the danger that a person questioned will be induced "to speak where he would not otherwise do so freely[.]" First, detention of a motorist pursuant to a traffic stop is presumptively temporary and brief. The vast majority of roadside detentions last only a few minutes. A motorist's expectations, when he sees a policeman's light flashing behind him, are that he will be obligated to spend a short period of time answering questions and waiting while the officer checks his license and registration, that he may be given a citation, but that in the end he most likely will be allowed to continue on his way. In this respect, questioning incident to an ordinary traffic stop is quite different from station house interrogation, which frequently is prolonged, and in which the detainee often is aware that questioning will continue until he provides his interrogators the answers they seek.
 Second, circumstances associated with the typical traffic stop are not such that the motorist feels completely at the mercy of the police. To be sure, the aura of authority surrounding an armed, uniformed officer and the knowledge that the officer has some discretion in deciding whether to issue a citation, in combination, exert some pressure on the detainee to respond to questions. But other aspects of the situation substantially offset these forces. Perhaps most importantly, the typical traffic stop is public, at least to some degree. Passersby, on foot or in other cars, witness the interaction of officer and motorist. This exposure to public view both reduces the ability of an unscrupulous policeman to use illegitimate means to elicit self-incriminating statements and diminishes the motorist's fear that, if he does not cooperate, he will be subjected to abuse. The fact that the detained motorist typically is confronted by only one or at most two policeman further mutes his sense of vulnerability. In short, the atmosphere surrounding an ordinary traffic stop is substantially less "police dominated" than that surrounding the kinds of interrogation at issue in Miranda, itself, and in the subsequent cases in which we have applied Miranda.
 Id. at 437-439 (citations omitted).
In Stansburg v. California (1994), 514 U.S. 318, the Supreme Court held that the "initial determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogatory officer or the person being questioned."
In State v. Warrell (1987), 41 Ohio App.3d 206, the Medina County Court of Appeals held that requiring a DUI suspect to sit in a police cruiser for a period of time to answer a few questions did not elevate the situation beyond the realm of the ordinary traffic stop approved inBerkemer.
In this case Martin was told by Emerson at the time that she was stopped for jaywalking that she would not be arrested but would be merely cited for the violation. The trial court found that it was reasonable for Officer Emerson to place Martin in his cruiser while he wrote out her citation. The trial court simply thought it inappropriate for Emerson to ask a jaywalker about drugs. While this inquiry may have been inappropriate, it did not convert an investigative stop into a formal arrest or a restraint on Martin's freedom of the degree commonly associated with an arrest. Accordingly, Officer Emerson was not required to comply with the requirements of Miranda before asking questions of Martin. Accordingly, Martin's admissions provided the basis for probable cause to search her for the cocaine she possessed. The State's assignment of error is Sustained.
The judgment of the trial court will be Reversed and Remanded for further proceedings consistent with this opinion.
WOLFF, P.J., and GRADY, J., concur.